IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

| | |
|---|---|
| ALEXIS RICKER, | 3:16-CV-121-JAJ-CFB |
| Plaintiff, | |
| vs. | |
| NANCY A. BERRYHILL, | |
| COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION |
| Defendant. | |

Plaintiff Alexis Ricker moves for reversal of Defendant Social Security Commissioner's decision denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act") and supplemental security income payments ("SSI") under Title XVI of the Act. 42 U.S.C. §§ 401–434, 1381–1385. Alternatively, Ricker moves for remand to the Commissioner with instructions to appropriately weigh the evidence in the record. The Commissioner asserts that the Court should affirm the denial of benefits, as the decision is supported by substantial evidence in the record as a whole. This Court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

Ricker complains that the Administrative Law Judge's ("ALJ") decision is not supported by substantial evidence, because the ALJ's determination of Ricker's residual functional capacity ("RFC") did not take into account the absences from work caused by Ricker's cyclical vomiting syndrome ("CVS"). Ricker disagrees with the ALJ's decision to discount the credibility of her testimony. Ricker asserts that the hypothetical used in questioning the vocational expert ("VE") was inaccurate and incomplete in that it failed to take into account the absences that would be caused by her CVS, such that the ALJ's decision was not supported by substantial evidence in

1

the record as a whole, particularly in light of additional testimony elicited from the VE in

response to questions from the ALJ and Ricker's attorney.

## I. PROCEDURAL HISTORY

Ricker filed a Title II application for DIB and a Title XVI application for SSI on January

9, 2014, alleging a disability onset date of August 12, 2012, due to CVS, ADHD, and anxiety.[1]

(Tr. 233–40). These claims were denied on March 6, 2014, (Tr. 97–116) and again upon

reconsideration on April 8, 2014. (Tr. 110–40). Ricker requested and received a hearing before

ALJ Susan F. Zapf on September 28, 2015. (Tr. 5). Ricker and Vocational Expert ("VE") Linda

M. Gels testified at the hearing. The ALJ found that Ricker was capable of making a successful

adjustment to other work that existed in significant numbers in the national economy and was not

disabled any time between August 12, 2012, the alleged onset date, and November 19, 2015, the

date of the ALJ's unfavorable decision. (Tr. 16). Ricker sought review before the Appeals

Council. She submitted additional evidence about CVS from the National Institute of Health

website; it was not included in the transcript, but is in the record as an attachment to Ricker's

Brief. (ECF 9-1).

The Commissioner's decision became final on October 20, 2016, when the Appeals

Council denied Ricker's request for review of the ALJ's decision. (Tr. 24). Ricker filed a timely

Complaint to appeal the denial of benefits (ECF 1). On March 28, 2017, this case was referred to

the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

(ECF 8).

---

[1] Ricker had previously applied for benefits on several prior occasions and was rejected. She applied for
DIB on February 18, 2010, (Tr. 217) and January 26, 2012. (Tr. 221). She applied for both DIB and SSI
on February 20, 2013. (Tr. 225, 227).

## II. FACTS AND ALJ DECISION

Ricker must have been disabled to qualify for benefits under the Act. The Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The ALJ used a five-step sequential evaluation to determine that Ricker was not disabled within the meaning of the Act.[2] On November 19, 2015, the ALJ issued a decision denying Ricker's claims for DIB under Title II and SSI under Title XVI of the Act. In her decision, the ALJ made the following findings:

- Ricker met the insured status requirements of the Act through June 30, 2015;

- She has not engaged in substantial gainful activity since August 12, 2012, the alleged onset date (20 C.F.R. §§ 404.1571 *et seq.*, 416.971 *et seq.*);

---

[2] 20 C.F.R. § 404.1520(a)(4) provides:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of [subpart P of part 404 of this chapter] and meets the duration requirement, we will find that you are disabled. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

- She has the following severe impairments: CVS, anxiety disorder, attention deficit hyperactivity disorder ("ADHD"), headaches, and marijuana abuse (20 C.F.R. §§ 404.1520(c), 416.920(c));

- She does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926);

- She has the RFC to perform a full range of work at all exertional levels, but with the following nonexertional limitations: no concentrated exposure to fumes, odors, dusts, gases, poor ventilation, or temperature extremes; no concentrated exposure to focused lighting such as spotlights or flickering lights, or loud noise. Mentally, she is limited to simple, routine, and repetitive tasks with only occasional interaction with coworkers, supervisors, and the public, and no fast-paced work, with production measured on a daily, not hourly, basis;

- She is unable to perform any past relevant work (20 C.F.R. §§ 404.1565, 416.965);

- She was born on September 27, 1988, and in 2012, on the alleged disability onset date, was 23 years old, which is classified as a younger individual age 18–49 (20 C.F.R. § 404.1563, 416.963);

- She has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564, 416.964);

- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant

is "not disabled," whether or not she has transferable job skills (*See* SSR 82-41; 20 C.F.R. Part 404, Subpart P, Appendix 2);

- Considering Ricker's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform (20 C.F.R. § 404.1569, 404.1569(a), 416.969, 416.969(a)); and

- Ricker has not been under a disability, as defined in the Act, from August 12, 2012, through November 19, 2015, the date of the ALJ's decision (20 C.F.R. § 404.1520(g), 416.920(g)).

(Tr. 7–16).

## A. Educational and Vocational Factors

Ricker was born on September 27, 1988, and was 26 years old at the time of the hearing in 2015. (Tr. 42). She is a high school graduate and has completed about one semester of college. (Tr. 44). She has past work experience as a waitress, a gas station attendant, and a painter. (Tr. 44–46). At the time of the hearing, she resided in Davenport, Iowa, with her boyfriend.

## B. Medical Evidence[3]

On August 11, 2012, the day before her alleged disability onset date, Ricker visited the emergency room at Genesis Medical Center in Davenport, Iowa, complaining of vomiting. (Tr. 532). She reported that the vomiting had begun 12 days prior. The treating physician noted that the vomiting was constant and the vomit was clear, and that there was no dysuria. (Tr. 538). He noted that her gastrointestinal region felt soft, with mild, generalized tenderness. A pregnancy test was negative. (Tr. 537). She was discharged two and a half hours later when her condition

---

[3] To facilitate review, Ricker's medical treatments for CVS and psychiatric visits are listed in Appendix A, summarized in two separate charts prepared by the Court from the record.

improved. She was instructed to follow up within one week with her primary care doctor. (Tr. 541).

On September 22, 2012, Ricker visited the emergency room at Genesis, complaining of prolonged vomiting. (Tr. 522). She reported that she had been nauseous and vomiting for 12 hours. (Tr. 528). The treating nurse practitioner noted that the vomiting was constant but fluctuating in intensity, and that Ricker was vomiting up a bilious substance. Ricker also complained of abdominal pain and diarrhea. All other gastrointestinal symptoms were negative. She tested positive for THC metabolites. (Tr. 526). A pregnancy test was negative. The treating nurse practitioner instructed Ricker to follow up with the gastrointestinal specialist she sees in Iowa City within three days. She was prescribed Phenergan, Ciprofloxacin, and Famotidine. (Tr. 531).

On October 6, 2012, Ricker visited the emergency room at Genesis, complaining that she had been vomiting for nine hours, since 4:00 a.m. (Tr. 509, 517). The treating physician noted that the vomiting was constant and moderate, and the regurgitated fluid was clear. He prescribed Phenergan. Ricker reported abdominal pain, but denied diarrhea, fever, chills, chest pain, shortness of breath, back pain, and blood in her stool. A pregnancy test was negative. Ricker was reevaluated approximately three hours later, and reported feeling much better; her vomiting had stopped and her nausea had improved. (Tr. 520).

On October 31, 2012, Ricker visited the emergency room at UnityPoint Health, Trinity Hospital, in Bettendorf, Iowa. (Tr. 719). She complained about vomiting and diarrhea throughout the night, which persisted into the day. (Tr. 720). She was unable to keep down fluids. She denied any abdominal pain other than her stomach. At the hospital, she was actively vomiting.

Ricker was placed on an IV and her condition improved. (Tr. 722). She was discharged home with Reglan and instructed to gradually rehydrate herself.

On November 16, 2012, Ricker visited the emergency room at UnityPoint Health, complaining of abdominal pain, nausea, and vomiting for the past six to twelve hours. (Tr. 728–29). She reported that she had been woken from her sleep by nausea and vomiting. A physical examination revealed that her abdomen appeared normal and there was no tenderness, and bowel sounds were normal. She continued vomiting at the hospital, but was no longer experiencing diarrhea. (Tr. 730). Ricker's symptoms improved over the course of several hours, and she was discharged. She was prescribed Ciprofloxacin and Promethazine. (Tr. 733).

On November 20, 2012, Ricker visited the emergency room at UnityPoint Health, complaining of abdominal pain and vomiting. (Tr. 740). She did not vomit while at the emergency room. (Tr. 741). Ricker reported that the current vomiting episode had started the prior day, and it usually occurred two to four times per day. She was diagnosed with unspecified noninfectious gastroenteritis and colitis. (Tr. 740). Ricker drank fluids in the emergency room, and her condition gradually improved. She was prescribed a Phenergan suppository and was discharged. (Tr. 745).

On January 4, 2013, Ricker visited the emergency room at UnityPoint Health, complaining of nausea and vomiting. (Tr. 751). Ricker reported that the current episode of vomiting began 12 to 24 hours prior. She was negative for diarrhea and abdominal distention. Following an examination, the treating physician suspected that Ricker may be suffering from a small ovarian cyst. (Tr. 757). Ricker was transferred to the University of Iowa Hospitals and Clinic to have the cyst analyzed.

Later on January 4, 2013, Ricker was seen at the University of Iowa Hospitals and Clinics. (Tr. 663). She reported frequent episodes of vomiting chronically and an acute increase in right low back and pelvic pain, associated with increased nausea. She denied having a fever. The treating physician found all other systems to be negative. The physician conducted a physical exam. He noted that Ricker appeared uncomfortable. He found that her abdomen was soft, non-tender, and non-distended. Her bowel sounds were normal. Ricker reported that she had diarrhea and sometimes experienced constipation. (Tr. 666–67). She stated that she did not eat regular meals, and often skipped breakfast because her symptoms are worse in the morning. The treating physician found the exam results to be consistent with a small ovarian cyst, and discussed treatment options with her. (Tr. 665).

On January 9, 2013, Ricker visited Vera French Mental Health Center ("Vera French") in Davenport, Iowa, where she was seen by Michelle Schnack, a nurse practitioner. (Tr. 487). Ricker reported no difficulties falling or staying asleep, and estimated that she was getting about eight hours of sleep per night. She reported an adequate appetite. She denied delusions and hallucinations. Ricker was prescribed Zoloft and Xanax. She had not been taking Zoloft or Seroquel, which she had previously been prescribed, because she could not afford them. The nurse practitioner cancelled Ricker's Adderall prescription. Ricker reported that she was smoking daily. The nurse practitioner arranged for Ricker to have a follow-up appointment within four months. Ricker did not mention vomiting, nausea, abdominal pain, or CVS.

On January 22, 2013, Ricker visited the emergency room at UnityPoint Health, complaining of vomiting. (Tr. 767). She had no fever, no abdominal pain, and no diarrhea. She reported that she had been vomiting since 4:00 a.m. (Tr. 773). She was instructed to take Phenergan for her nausea, and educated regarding her marijuana use and CVS. (Tr. 772). Based

on lab results, it was determined that Ricker also suffered from a urinary tract infection. (Tr. 767). She was discharged home later that day.

On February 21, 2013, Ricker visited the emergency room at UnityPoint Health, complaining of persistent vomiting and abdominal pain since 8:00 p.m. the prior day. (Tr. 780). She denied having diarrhea. While in the emergency room, Ricker did not vomit. Eventually she felt well enough to be discharged. She was instructed to take Phenergan every six hours as needed to control her nausea.

On March 1, 2013, Ricker visited the emergency room at Genesis, reporting that she had been experiencing vomiting, diarrhea, and abdominal pain for 24 hours, and was not able to keep anything down. (Tr. 498). She stated that she had chronic abdominal pain, was feeling nauseous, vomiting, and having diarrhea. Ricker reported that she was using marijuana and cigarettes, and that she was employed as a dancer. (Tr. 500). A physical examination was performed; the findings were unremarkable. The doctor prescribed Phenergan.

On April 3, 2013, Ricker visited the University of Iowa Hospitals and Clinics ("UIHC") for her chronic vomiting. (Tr. 669). The treating physician suspected that her chronic marijuana use may have caused complications with the CVS. (Tr. 670). He discussed this possibility with her, and suggested that she reduce her use of narcotics.

On May 8, 2013, Ricker visited Vera French for treatment of her panic disorder, generalized anxiety disorder, and ADHD. (Tr. 692). She was seen by Dr. William Nissen, M.D. Ricker reported that her CVS was preventing her from working, because she never knew when she would vomit. Dr. Nissen noted that he had been seeing Ricker for years, but that this was the first time she had informed him of her CVS. He noticed no weight loss. Dr. Nissen noted that she was taking Seroquel, Zoloft, Xanax, and Adderall, and that the combination of medications had

done a reasonable job controlling her panic and generalized anxiety disorder, and had helped her ADHD. (Tr. 692). He noted that Ricker appeared pleasant and was neatly groomed. Dr. Nissen instructed her to continue her medications and return in four months.

On June 3, 2013, Ricker visited Dr. Raurang Agrawal, M.D., at UIHC, complaining of chronic nausea. (Tr. 876). She reported that she smoked three to four pipes of marijuana per day to control her symptoms and increase her appetite. (Tr. 876). A stool sample was taken. Dr. Agrawal instructed her to use Scopolamine patches to help control her nausea.

On September 12, 2013, Ricker visited Vera French for treatment of her panic disorder, generalized anxiety disorder, and ADHD. (Tr. 695). Dr. Nissen noted that she was still on the same medications, which were doing a reasonably good job of controlling her disorders. He noted that Ricker's appetite was good, and that her weight was up seven pounds. He observed that she was neatly groomed and in no distress. Dr. Nissen instructed her to continue her medications and return in four months. (Tr. 696).

On January 13, 2014, Ricker visited UIHC, complaining of vomiting and nausea. (Tr. 879). Dr. Agrawal had a stool sample taken, and instructed her to stop smoking and drinking carbonated beverages. He noted that he did not believe she had been taking her medications as instructed.

On January 23, 2014, Ricker visited Vera French for treatment of her panic disorder, generalized anxiety disorder, and ADHD. (Tr. 698). Dr. Nissen noted that her medication was keeping her anxiety symptoms in good control, and that her ADHD symptoms were stable. He also noted that Ricker had new treatment for her CVS; she had been wearing a Scopolamine patch behind her ear. She informed him that her vomiting had improved considerably. (Tr. 698).

Dr. Nissen noted that she appeared well-groomed and in no distress. He instructed her to continue her medications and return in four months.

On January 28, 2014, Ricker visited the clinic at UIHC for her nausea and vomiting, because she was dissatisfied with Dr. Agrawal. (Tr. 883). She reported that she vomited two to ten times per day, at least three days a week, and she had diarrhea between two and six times per day. She stated that she smoked marijuana occasionally; she smoked two to ten cigarettes per day; she did not drink alcohol; and she ate mostly just crackers and Sprite. The treating physician assistant noted that Ricker was experiencing nausea, vomiting, diarrhea, and abdominal pain. She instructed her to stop smoking cigarettes, using marijuana, and drinking carbonated beverages; she also instructed Ricker to continue taking Zofran and Phenergan and to try dicyclomine, but to stop Scopolamine because it was not helping.

On January 29, 2014, Ricker visited the emergency room at UnityPoint Health, complaining that she had been vomiting since noon the day before. (Tr. 807–08). She reported that she had vomited over 30 times in the past two days, and that she had mild abdominal pain. She was not suffering from diarrhea, constipation, or abdominal distention. Ricker was given an IV, Zofran, Reglan, and Benadryl. Eventually she was determined to be in stable condition and was discharged from the hospital.

On January 30, 2014, Ricker visited the clinic at UIHC with her mother. (Tr. 888). She asked the physician assistant there to help her immediately with her chronic nausea and vomiting. The physician assistant informed them that it would be a long-term process; she believed that there may be a psychological component to the problem, and it may be necessary to see a therapist. Ricker's stool sample tested positive for *clostridium difficile* ("*C. difficile*"), a

bacterial infection of the colon. Ricker arranged to see a psychologist for psychotherapy. (Tr. 891).

On February 21, 2014, Ricker visited the clinic at UIHC for treatment for her diarrhea, vomiting, and nausea. (Tr. 892). The treating physician assistant started her on Marinol, ordered a colonoscopy and endoscopy, and determined that her stool should be rechecked for *C. difficile*. (Tr. 895).

On March 4, 2014, Ricker visited the clinic at UIHC. (Tr. 896). She reported that she was still vomiting most days, about three times in the morning. The treating physician ordered that a colonoscopy and upper endoscopy be scheduled.

On March 7, 2014, Ricker visited the clinic at UIHC. (Tr. 899). She complained of chronic vomiting. She reported using about one gram or less of marijuana per day. She was referred to a doctor for hypnotherapy.

On March 11, 2014, Ricker visited UIHC for a colonoscopy. (Tr. 903). Other than testing positive for *C. difficile*, the results of her colonoscopy were normal.

On March 30, 2014, Ricker visited the clinic at UIHC, complaining of nausea and vomiting. (Tr. 907). Her evaluations were unremarkable. The treating nurse practitioner discussed home care measures with her.

On April 9, 2014, Ricker visited the clinic at UIHC, complaining of periodic bouts of severe vomiting and diarrhea. (Tr. 911). She reported that she experienced bouts of diarrhea every one to two weeks, which last from a few hours to three days. She reported that she had smoked marijuana daily for the past four years. The treating physician recommended that she stop smoking marijuana, but Ricker was not interested. (Tr. 914). Ricker was taking Flagyl for her *C. difficile* infection.

On April 23, 2014, Ricker visited UIHC for an upper endoscopy. (Tr. 921). The
procedure revealed that she had mild reflux esophagitis and short linear erosions at her
gastroesophageal junction.

On May 21, 2014, Ricker visited the clinic at UIHC for a physical. (Tr. 925). Her treating
physician discussed CVS with her, and recommended that she stop smoking marijuana. She
reported that she would like to continue using marijuana. The physician advised her to stop
smoking cigarettes, but she refused. (Tr. 930). The physician also discussed Ricker's obesity
with her, and recommended exercise and healthy eating. Ricker stated that she was more
interested in taking care of her CVS first.

On May 22, 2014, Ricker returned to Vera French for treatment of her panic disorder,
agoraphobic disorder, generalized anxiety disorder, and ADHD. (Tr. 710). Dr. Nissen noted that
her psychiatric condition was doing well, but that she said she was still struggling with CVS,
which interfered with her life and ability to work. He noted that she had gained three pounds.
Ricker was still taking Zoloft, Xanax, and Adderall, but was off of Seroquel. Dr. Nissen
instructed her to continue her remaining medications and to return in four months.

On June 22, 2014, Ricker visited the emergency room at UnityPoint Health, complaining
of vomiting and abdominal pain. (Tr. 820). She reported that she had been feeling ill for two or
three days, and had vomited ten times per day since the onset. She did not vomit while in the
emergency room.

On June 23, 2014, Ricker visited the hospital at UIHC. (Tr. 932). She reported that she
had been experiencing nausea and vomiting for 24 hours. Physicians found no evidence of acute
surgical emergency or infection requiring antibiotics. Ricker was advised to continue taking

Ibuprofen and Tylenol for her pain, and to follow up with her primary care physician if symptoms continued.

On September 4, 2014, Ricker visited the emergency room at UnityPoint Health, complaining of nausea and vomiting. (Tr. 835). She also reported suffering from abdominal pain. Ricker told a nurse that she had begun vomiting three hours prior while she was "out on the river." (Tr. 840). She was given Benadryl and Reglan; soon she felt well enough to be discharged.

On September 11, 2014, Ricker returned to see Dr. Nissen at Vera French for treatment of her panic disorder, agoraphobia, generalized anxiety disorder, and ADHD. (Tr. 713). She remained on the same combination of medications, which Dr. Nissen noted kept her mood and anxiety symptoms stable, and her ADHD symptoms in control. She reported that she was still struggling with CVS, but that her appetite was good. Her weight had increased six pounds. He noted that Ricker appeared pleasant and appropriately groomed, and that her mood was bright. He instructed her to continue taking Xanax and Zoloft, to begin taking Seroquel, to stop taking Adderall, and to return in four months. (Tr. 714).

On October 19, 2014, Ricker visited the emergency room at Genesis, complaining of vomiting. (Tr. 1053). She reported that she had been nauseous and vomiting for two days. She drank fluids, and when she felt better she was discharged.

On November 23, 2014, Ricker visited the emergency room at UnityPoint Health, complaining of vomiting. (Tr. 846). She reported that she had been vomiting for seven hours, since 3:00 a.m. She was also nauseous and suffering from abdominal pain, but did not have diarrhea. Once her condition improved, she was discharged home.

On December 25, 2014, Ricker visited the emergency room at Genesis, complaining of vomiting. (Tr. 962). She reported that her mother had run out of marijuana, and that she had not smoked it in three days. Her physical exam and lab test were unremarkable. The treating physician diagnosed her with "Cyclical Emesis Syndrome of Marijuana," which is persistent vomiting linked to marijuana abuse. When she felt better she was discharged.

On February 23, 2015, Ricker visited the clinic at UIHC. (Tr. 936). She reported that she had felt better the previous few months; she was occasionally nauseous, but was not vomiting. She still smoked marijuana. The physician noted that she had gained about 15 pounds since her previous visit in June 2014. The physician also noted that she was a carrier of *C. difficile*.

On February 24, 2015, Ricker returned to Vera French for treatment of her panic disorder, agoraphobia, generalized anxiety disorder, and ADHD. (Tr. 716). Dr. Nissen noted that she was tolerating the medications well. Ricker reported that she was still struggling with CVS, and was trying to obtain disability benefits. Dr. Nissen noted that her appetite was good and her weight was up 17 pounds since her visit in September 2014. She appeared friendly and neatly groomed. Dr. Nissen instructed her to continue taking her medications and to return in six months. (Tr. 717).

On March 8, 2015, Ricker visited the emergency room at Genesis, complaining of vomiting. (Tr. 954). She reported that she had been nauseous and vomiting for about nine hours, since 3:00 that morning. Her physical examination and lab test were unremarkable. When she felt better, she was discharged.

On July 14, 2015, Ricker visited UnityPoint Health, on a referral from Dr. Peter Merrell, complaining that she had injured her left ankle about a month prior while fishing. (Tr. 1073). Her treating physician diagnosed her with an "unstable osteochondral dessicans lesion" on her ankle,

15

meaning that fragments of bone had come loose in her ankle. She had surgery for a left-ankle arthroscopy and placement of biocartilage. Following the procedure, she was given crutches and instructions for recovery, and was discharged.

## C. Hearing Testimony

At the September 2015 hearing, Ricker described her CVS symptoms over the past 10 years as periods of nausea and vomiting three or four times per week, with episodes lasting four to eight hours. (Tr. 51–52). She stated that she usually just vomits fluid and bile, resulting in dehydration and emergency room visits three to four times per month. (Tr. 57, 61). She estimated that she had visited emergency rooms over 30 times in 2014–2015. (Tr. 58). Ricker testified that she feels nauseous every day, and that her weight had fluctuated by around 20 to 40 pounds. (Tr. 53, 60).

Ricker also testified regarding her work and life limitations. She stated that CVS precludes her from holding a job, because she is frequently absent due to sustained periods of vomiting and abdominal pain. (Tr. 46–47). She stated that she drives her boyfriend—with whom she lives—32 miles to work several times a week when he cannot find a ride (for an average of 100 miles per week). (Tr. 44). Ricker stated that she usually does household chores, including dishes, cooking, and her laundry at a laundromat downtown. (Tr. 54). She alleged that some weeks she does not do her chores, because she does not feel well. (Tr. 54). She stated that when she leaves the house, she takes a bag with her in which to vomit. (Tr. 55). Ricker testified that she sometimes visits friends, and that she does not drink alcohol, but she usually smokes half a pack of cigarettes per day. (Tr. 56).

Ricker stated that her vomiting episodes are triggered by stress, heat, her menstrual period, motion sickness, physical exhaustion, eating too much or too little, not eating at the right

time of day, eating certain foods, colds, and allergies. (Tr. 48). She stated that sometimes she wakes in the middle of the night to vomit, and that sometimes a vomiting episode will occur and she does not know what triggered it. (Tr. 48, 56).

To manage her symptoms, Ricker stated that she takes Zofran, both in tablet and suppository form. (Tr. 48). She also uses marijuana, which she receives from her mother, three to four times per week, and Marinol, a prescription drug created from marijuana. (Tr. 49). Ricker alleged that the marijuana helps reduce her vomiting so that she can keep her pills down, and that she never uses it outside of treatment. (Tr. 49). She was also taking an antacid. (Tr. 51). Ricker stated that she has tried several diets to manage her symptoms, including the low-carb "South Beach" diet and a gluten-free diet. (Tr. 55).

At the hearing, the ALJ questioned VE Linda Gells about a hypothetical individual having the following constraints:

- Ricker's age, education, and past work experience;

- no exertional impairments;

- limited in terms of no concentrated exposure to fumes, odor, dust, gasses, poor ventilation, temperature extremes, focused lighting, loud factory-level noise;

- limited to simple, routine, repetitive tasks, having only occasional interaction with coworkers, supervisors, and the public;

- no fast-paced work;

- production measured on a daily, instead of an hourly, basis. (Tr. 63, 65).

The VE testified that the hypothetical person would not have any past relevant work she could perform, but that she would be able to perform the jobs of cleaner/housekeeper, linen room

attendant, and hospital cleaner. The VE testified that all of these jobs exist in substantial numbers in the economy. (Tr. 67).

The VE testified that employers would not tolerate a pattern of unscheduled breaks on a repeated, irregular basis that varied daily. (Tr. 67–68). She stated that employers would permit one or two unscheduled 10-minute breaks per week, but would not tolerate three unscheduled breaks per week. She testified that an employee would be expected to be on task at least 85–90% of their shift.

The VE also testified that employers would not tolerate more than one absence per month. (Tr. 68). According to the VE, many employers will not tolerate any absences during the probationary period at the beginning of an individual's employment.

Ricker's grandmother filed a Third-Party Function Report on April 21, 2013, and again on February 2, 2014. (Tr. 290, 341). Ricker's grandmother stated that Ricker sometimes vomits for three to eight hours per day, two to three days at a time; that Ricker usually wakes up vomiting; and that nausea and vomiting keep her up three to five days and nights per week. Ricker's grandmother stated that Ricker goes outside two to four times per week, and drives once or twice a week. (Tr. 344). She reported that Ricker enjoyed being outdoors, working, fishing, and camping, but can only do these things when she is "having a good day." (Tr. 345). Ricker's grandmother stated that stress triggers Ricker's vomiting.

### III. STANDARD OF REVIEW

The Court will uphold an ALJ's decision if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). Substantial evidence is less than a preponderance, but is enough that "a reasonable mind would find [it] adequate to support the Commissioner's conclusion." *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015) (quoting *Blackburn v. Colvin*,

761 F.3d 853, 858 (8th Cir. 2014)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971) (reasoning that substantial evidence means "more than a mere scintilla"). The Court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010). If substantial evidence supports the ALJ's decision, the Court will not reverse merely because substantial evidence exists in the record that would support a contrary outcome, or because the Court would have determined the case differently. *Myers v. Colvin*, 721 F.3d 521, 524 (8th Cir. 2013) (citing *England v. Astrue*, 490 F.3d 1017, 1019 (8th Cir. 2007)). The ALJ's decision must have been outside the available "zone of choice" for it to warrant reversal. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (citing *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). That a reviewing court may have reached a different decision is not grounds for reversal so long as substantial evidence supports the ALJ's decision. *Id.*

The Court also reviews the Commissioner's decision to determine if there was a procedural error, an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). Issues of law are reviewed *de novo*, with deference accorded to the Commission's construction of the Social Security Act. *Petersen v. Astrue*, 633 F.3d 633, 636 (8th Cir. 2011) (citing *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992)).

To establish entitlement to benefits, a claimant must show he or she is unable to engage in any substantial gainful activity by reason of a medically determinable impairment that has lasted, or can be expected to last, for a continuous period of at least 12 months. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A). The claimant bears the burden of persuasion in proving the RFC. *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (citing *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010)).

# IV. DISCUSSION

The ALJ's decision followed the five-step sequential evaluation set forth in the Social Security regulations. *See* 20 C.F.R. §§ 404.1520, 416.920. The parties do not dispute the ALJ's findings in the first four steps of the analysis. The ALJ found that Ricker had an RFC to perform a full range of work at all exertional levels, but with several nonexertional limitations, including no concentrated exposure to fumes, odors, gases, focused lighting, and loud noise. The ALJ's decision also factored limitations on pace, productivity, and contact with others. Based on this RFC finding, the ALJ found that Ricker was not disabled, because there were jobs existing in significant numbers in the national economy that she could perform, including cleaner/housekeeper, linen room attendant, and hospital cleaner. The ALJ did not find Ricker's alleged subjective limitations credible because they were not supported by substantial objective medical evidence in the record.

Ricker argues that the ALJ's finding of RFC is not supported by substantial evidence, as it does not fairly represent the true nature and severity of Ricker's CVS, and because it does not take into account the absences and time lost due to nausea and vomiting. Ricker also argues that her subjective complaints of pain and limitations were improperly discounted, because the ALJ did not identify inconsistencies in her testimony, or the basis for discounting her credibility.

## A. Whether the ALJ Properly Considered Ricker's Potential Absences from Work

Ricker argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to take into account her frequent hospital visits and the VE's testimony that employers would not tolerate more than one absence from work per month, nor any absences during a probationary period. The Commissioner argues that the ALJ's determination was supported by substantial evidence, because, according to their view of the record, Ricker's

hospital visits from 2012 to 2015 averaged only eight days a year, or fewer than one absence per month, a level that employers would tolerate.

"The ALJ must at least minimally articulate reasons for crediting or rejecting evidence of disability." *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004). When the evidence indicates that the claimant may be absent from work more frequently than most employers would permit, the ALJ should consider that in determining whether the claimant is disabled. *See Gajos v. Colvin*, 225 F. Supp. 3d 682, 694 (N.D. Ill. 2016); *Connor v. Shalala*, 900 F. Supp. 994, 1003–04 (N.D. Ill. 1995); *see also Bouchard v. Barnhart*, 38 F. App'x 332, 336 (7th Cir. 2002). *Cf. Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015); *Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996) ("The ALJ's hypothetical question need include only those impairments that the ALJ finds are substantially supported by the record as a whole.").

The VE testified that a hypothetical person of Ricker's age, education, and limitations could perform several jobs that exist in significant numbers in the relevant economy. The VE also testified that employers would tolerate no more than two unscheduled breaks per week, no more than one absence per month, and no absences during a probationary period.

Even ignoring Ricker's subjective complaints of pain and her reports of additional days spent at home vomiting due to CVS, and looking only at the frequency of hospital and emergency visits for treatment of CVS, it appears that CVS may cause Ricker to exceed the number of absences that most employers would tolerate. Between August 2012 and March 2015—a period of 32 months—Ricker visited the hospital or emergency room 30 times for treatment of her CVS, an average of nearly one visit per month.[4] Further, 24 of those visits were

---

[4] This number considers doctor visits and hospital visits where the primary purpose of the visit is vomiting, nausea, or treatment of vomiting or nausea. It does not include Ricker's May 21, 2014, visit to UIHC for a physical examination (ECF 925); her February 23, 2015, visit to UIHC for a checkup (ECF 936); and her visits to Vera French for mental health treatment. This number includes CVS-related visits

within one month of another visit for CVS treatment. Based on the VE's testimony, an employer would find this number of absences to be intolerable, particularly during a probationary period.

In her decision, the ALJ found Ricker's testimony regarding the severity and frequency of her symptoms to not be credible. The ALJ did not discuss, however, whether Ricker's doctors and hospital visits for treatment of CVS alone would cause her to miss more work than the VE testified would be permissible.

The VE's testimony, assuming that the hypothetical employee would have acceptable attendance, was essential to the ALJ's finding that Ricker was not disabled—there was no other evidence in the record to which the ALJ could point to show that there were jobs in the national economy that Ricker could perform. The ALJ did not articulate the reasons she accepted a portion of the VE's testimony, but discounted the VE's testimony regarding whether, if the employee exceeded the number of permissible absences, there will be jobs available. Additionally, the ALJ failed to articulate why Ricker's frequent doctor's visits and symptoms of CVS that led up to the emergency room visits would not cause her to miss more work than the VE testified was acceptable to maintain employment. The ALJ did not discuss absences from work for other hospital visits (for diagnosis, testing, and checkups related to CVS). The ALJ was required to articulate the reasons for discounting the facts in the record as to the number of days Ricker was available to work on a regular basis (even limited to factoring in only emergency room and hospital visits), which impacted the finding of Ricker's RFC.

In the ALJ's decision that Ricker was not disabled, the ALJ failed to address why she did not rely on the VE's testimony regarding the type of permissible absences for employment and

---

to Unity Point Health, which the Commissioner failed to acknowledge in her brief (ECF 10). The charts at Appendix A, which summarize Ricker's medical records, separate Ricker's CVS and psychiatric treatments.

how that impacted the jobs available to Ricker. The determination that there were a significant

number of jobs in the economy that Ricker could perform did not reflect the record as a whole as

to the number of days Ricker was treated for CVS. Remand is necessary so that the ALJ can

explain her findings.

## B. Whether the ALJ Impermissibly Discounted Ricker's Subjective Complaints of Pain and Limitation

Ricker argues that the ALJ improperly discounted her testimony, because the ALJ did not

identify inconsistencies in her testimony that caused the ALJ to give no weight to her description

of symptoms, or their impact on her ability to work. The Commissioner argues that the ALJ's

finding that Ricker's activities of daily living are inconsistent with her subjective allegations is

supported by substantial evidence in the record.

It is the ALJ's duty to evaluate the claimant's credibility based on "the claimant's daily

activities; duration, frequency, and intensity of the pain; precipitating and aggravating factors;

dosage, effectiveness and side effects of medication; and functional restrictions." *Mouser v.*

*Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th

Cir. 1984)). "An ALJ may discount a claimant's subjective complaints if there are

inconsistencies in the record as a whole. 'Where adequately explained and supported, credibility

findings are for the ALJ to make.'" *Van Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008)

(quoting *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000)) (citation omitted). The Eighth Circuit

has held that a claimant's failure to follow her physicians' instructions to take her medications,

follow her diet, and abstain from drugs and alcohol are valid reasons to discredit her subjective

complaints. *See Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008).

The ALJ considered Ricker's complaints of pain and functional limitations—and Ricker's grandmother's Third-Party Function Report—but found them not to be credible to the extent that they conflicted with the finding of RFC. The ALJ found that, while Ricker has impairments that could reasonably be expected to cause pain and limitation, the degree of pain and limitation Ricker described was not consistent with the objective medical evidence or her functional abilities, including her reported daily activities. The ALJ hypothesized to the VE that Ricker's limitations would include the need for only occasional, varied, 10-minute breaks twice a week.

The ALJ noted that Ricker testified that she does not do outdoor activities, but the medical records from 2014 and 2015 reveal that she occasionally fished, cut timber, and went to the river. The ALJ noted that Ricker testified that motion sickness was a trigger for her CVS, but that she still drove her boyfriend to work every day.[5] Ricker testified that there are certain triggers for her CVS, but indicated to treatment providers that she was not aware of any specific triggers. The ALJ noted that Ricker did not follow her treatment providers' instructions to take medication, including Flagyl for her *C. difficile*; nor did Ricker heed her treatment providers' instructions to abstain from marijuana, which may have been contributing to CVS symptoms. The ALJ also observed that, although Ricker claimed she was consuming mostly just crackers and Sprite, during the relevant time frame her weight increased significantly. Further, Ricker did not mention her CVS to her psychiatrist until May 2013, although she claimed to have suffered

---

[5] In her decision, the ALJ stated that Ricker "drives her boyfriend to work, 32 miles, daily," (Tr. 13). At the hearing, Ricker testified that she drives, on average, 100 miles per week, which includes driving her boyfriend 32 miles to work on occasions when he cannot find a ride, or about twice a week. (Tr. 44). This discrepancy in the number of miles Ricker drove per week is at best minimal in this credibility finding, but should be addressed on remand.

from it since she was a child, and had made ten emergency room and hospital visits for CVS in the preceding 11 months.

The ALJ considered the relevant factors in evaluating Ricker's subjective complaints of pain and limitation. There is substantial evidence to support the ALJ's finding that Ricker's subjective complaints about pain, intensity, and limitation are not entirely credible, but on remand the ALJ should explain why she totally discounted these complaints, and Ricker's grandmother's Third-Party Function Report, in determining Ricker's RFC, considering her finding that CVS was one of Ricker's severe impairments.

## V. CONCLUSION

The ALJ's determination that there were a significant number of jobs in the economy that Ricker could perform is not supported by substantial evidence in the record. The ALJ erred in failing to articulate why Ricker's symptoms resulting in frequent doctor's visits for treatment of CVS would not cause her to exceed the number of absences the VE testified employers would tolerate. The ALJ's decision should be reversed and remanded for the ALJ to consider the work-preclusive effect of absences caused by CVS, and to articulate her reasoning on this issue. Specifically, the ALJ should articulate why, even discounting Ricker's credibility, Ricker has failed to establish that she will be consistently absent from work for medical reasons more than once per month, thereby precluding her from working.

## VI. REPORT AND RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED that the Commissioner's decision to deny Ricker benefits be reversed and remanded for proceedings consistent with this opinion.

IT IS ORDERED that the parties have until November 17, 2017, to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(C). Any objections filed

must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *see also St. Jude Med. S.C., Inc. v. Tormey*, 779 F.3d 894, 902 (8th Cir. 2015) (citing *McDonald v. City of St. Paul*, 679 F.3d 698, 709 (8th Cir. 2012)). Failure to timely file objections may constitute a waiver of Plaintiff's right to appeal questions of fact. *United States v. Kelley*, 774 F.3d 434, 439 (8th Cir. 2014) (citing *Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

Dated this 3rd day of November, 2017.

**CELESTE F. BREMER**
**UNITED STATES MAGISTRATE JUDGE**

**Appendix A**

Psychiatric Visits

| Date | Location | Reason for Visiting | Notes | Transcript Page |
|------|----------|---------------------|-------|-----------------|
| January 9, 2013 | Vera French | Anxiety and ADHD | No difficulties sleeping. Adequate appetite. Smoking daily. No mention of vomiting, nausea. | 487 |
| May 8, 2013 | Vera French | Panic disorder, anxiety, ADHD | First mention of CVS. No weight loss. Appeared pleasant. | 692 |
| September 12, 2013 | Vera French | Panic disorder, anxiety, ADHD | Appetite good. Weight up seven pounds. Neatly groomed, in no distress. | 695 |
| January 23, 2014 | Vera French | Panic disorder, anxiety, ADHD | Medications were controlling anxiety and ADHD. She was using Scopolamine patch for CVS; vomiting had improved considerably. | 698 |
| May 22, 2014 | Vera French | Panic disorder, agoraphobia, anxiety, ADHD | Psychiatric condition doing well. Still struggling with CVS. Weight up three pounds. | 710 |
| September 11, 2014 | Vera French | Panic disorder, agoraphobia, anxiety, ADHD | Psychiatric condition doing well. Still struggling with CVS. Weight up six pounds. Appeared pleasant. | 713 |
| February 14, 2015 | Vera French | Panic disorder, agoraphobia, anxiety, ADHD | Tolerating psychiatric medications. Still struggling with CVS; trying to get disability payments. Weight up 17 pounds. Appeared friendly. | 716 |

## Appendix A

<u>CVS Visits</u>

| Date | Location | Reason for Visiting | Notes | Transcript Page |
|---|---|---|---|---|
| August 11, 2012 | Genesis emergency room | Vomiting | Vomiting began 12 days prior. Condition improved; discharged 2.5 hours later. | 532 |
| September 22, 2012 | Genesis emergency room | Vomiting | Vomiting constant. Reported abdominal pain and diarrhea. Tested positive for THC metabolites. | 522 |
| October 6, 2012 | Genesis emergency room | Vomiting | Vomited for nine hours prior to admittance. Vomiting constant and moderate. Reported abdominal pain but no diarrhea. Condition improved; discharged 3 hours later. | 509 |
| October 31, 2012 | UnityPoint emergency room | Vomiting and diarrhea | Reported vomiting and diarrhea through night and into day. Actively vomiting at hospital. Placed on IV. Discharged home. | 719 |
| November 16, 2012 | UnityPoint emergency room | Vomiting, nausea, abdominal pain | Experienced symptoms for six to 12 hours before being admitted. Abdomen appeared normal. Vomiting continued, but diarrhea ceased. | 728 |
| November 20, 2012 | UnityPoint emergency room | Vomiting and abdominal pain | Vomiting episode started prior day; occurred two to four times per day. Did not vomit while at hospital. Condition improved and was discharged. | 740 |
| January 4, 2013 | UnityPoint emergency room | Vomiting and nausea | Vomiting episode started 12–24 hours prior. No diarrhea. Small ovarian cyst detected; was transferred to UIHC for analysis. | 751 |
| January 22, 2013 | UnityPoint emergency room | Vomiting | Vomiting episode started about eight hours prior. No diarrhea or abdominal pain. Educated about her marijuana use. UTI detected. Discharged home three hours later. | 767 |
| February 21, 2013 | UnityPoint emergency room | Vomiting and abdominal pain | Experienced symptoms since 8:00 PM prior day. No diarrhea. No vomiting while at hospital. Condition improved and she was discharged. | 780 |
| March 1, 2013 | Genesis emergency room | Nausea and vomiting | Symptoms began 24 hours prior. Experienced nausea, vomiting, diarrhea. | 498 |
| April 3, 2013 | UIHC | Chronic vomiting | Treating physician suspected chronic marijuana use may cause complications with CVS. Suggested reducing use of narcotics. | 669 |
| June 3, 2013 | UIHC | Chronic nausea | Reported the smoked three to four marijuana pipes per day in attempt to control symptoms. Instructed to use Scopolamine patches to control nausea. | 876 |

**Appendix A**

| Date | Location | Reason for Visiting | Notes | Transcript Page |
|---|---|---|---|---|
| January 13, 2014 | UIHC | Vomiting and nausea | Stool sample taken. Physician instructed her to stop smoking and drinking carbonated beverages. Noted that he did not believe she was taking her medications as instructed. | 879 |
| January 28, 2014 | UIHC | Vomiting and nausea | Reported to vomiting 2–10 times per day, 3–4 days per week; diarrhea 2–6 times per day. Smoked marijuana occasionally, 2–10 cigarettes per day. Instructed to stop smoking cigarettes, using marijuana, and drinking carbonated beverages. | 883 |
| January 29, 2014 | UnityPoint emergency room | Vomiting | Reported vomiting since noon the day before, 30 times in two days. Mild abdominal pain, but no diarrhea. Condition improved and she was discharged. | 807 |
| January 30, 2014 | UIHC | Chronic vomiting and nausea | Sought treatment of CVS. Stool sample tested positive for *C. difficile*. PA believed there may be psychological component to CVS; arranged for Ricker to see psychiatrist. | 888 |
| February 21, 2014 | UIHC | Vomiting, nausea, diarrhea | PA started her on Marinol, determined that stool sample should be rechecked for *C. difficile*. | 892 |
| March 4, 2014 | UIHC | Vomiting | Reported that she was vomiting most days, about three times in the morning. Colonoscopy and upper endoscopy ordered. | 896 |
| March 7, 2014 | UIHC | Chronic vomiting | Referred to a doctor for hypnotherapy. | 899 |
| March 11, 2014 | UIHC | Colonoscopy | Colonoscopy tested positive for *C. difficile*, otherwise normal. | 903 |
| March 30, 2014 | UIHC | Vomiting and nausea | Evaluations unremarkable. Treating nurse practitioner discussed home care measures. | 907 |
| April 9, 2014 | UIHC | Vomiting and diarrhea | Complained of periodic bouts of severe vomiting and diarrhea. Reported bouts of diarrhea every one to two weeks that lasted from a few hours to three days. Reported smoking marijuana daily for four years. Physician recommended she stop using marijuana, but she refused. | 911 |
| April 23, 2014 | UIHC | Upper endoscopy | Procedure revealed mild reflux esophagitis short linear erosions at her gastroesophageal junction. | 921 |
| May 21, 2014 | UIHC | Physical examination | Discussed CVS. Physician recommended she stop smoking marijuana; Ricker refused. Physician recommended she stop smoking cigarettes; Ricker refused. Physician recommended exercise and healthy diet to control her obesity; Ricker declined. | 925 |

**Appendix A**

| Date | Location | Reason for Visiting | Notes | Transcript Page |
|---|---|---|---|---|
| June 22, 2014 | UnityPoint emergency room | Vomiting and abdominal pain | Reported feeling ill for two or three days, had vomited 10 times per day since onset. Did not vomit in emergency room. | 820 |
| June 23, 2014 | UIHC | Vomiting and nausea | Reported experiencing nausea and vomiting for 24 hours. No evidence of acute surgical emergency or infection. | 932 |
| September 4, 2014 | UnityPoint emergency room | Vomiting and nausea | Reported experiencing nausea, vomiting, and abdominal pain. Stated that she had begun vomiting three hours prior while "out on the river." Given Benadryl and Reglan. | 835 |
| October 19, 2014 | Genesis emergency room | Vomiting | Reported nausea and vomiting for two days. Drank fluids and was eventually discharged. | 1053 |
| November 23, 2014 | UnityPoint emergency room | Vomiting | Reported vomiting for seven hours prior to being admitted. Exhibited nausea, vomiting, and abdominal pain; no diarrhea. Discharged home once condition improved. | 846 |
| December 25, 2014 | Genesis emergency room | Vomiting | Reported that her mother had run out of marijuana, and she had not smoked in three days. Physical exam and lab test unremarkable. Diagnosed with "cyclical emesis syndrome of marijuana." | 962 |
| February 23, 2015 | UIHC | Checkup | Reported feeling better the previous few months; was occasionally nauseous, but was not vomiting. Had gained 15 pounds since visiting in June 2014. Carrier of *C. difficile*. | 936 |
| March 8, 2015 | Genesis emergency room | Vomiting | Reported vomiting and nausea past 15 hours. Physical exam and lab test were unremarkable. Discharged when condition improved. | 954 |